# Chicago, Burlington & Quincy Railroad Company v. Arthur Weber, administrator.

1. EVIDENCE ACT—*sections 15 and 16 construed.* It would seem that the scope of these sections is to authorize the admission in evidence of copies of the record of the acts and proceedings of the board or body of officers charged by law with the conduct of the business of the corporation in such matters, and such matters only, as by law are provided or required to be acted upon by such board or body. It is merely the action of such board or body on such matter which when committed to the "paper, entry or record" may be proven by duly certified copy of such paper.

2. CERTIFIED COPIES—*of corporation contracts incompetent.* Copies of contracts made by a corporation with some other person or corporation when certified to by the secretary of such corporation are incompetent as against a third party.

3. PECUNIARY LOSS—*instruction as to, in action on the case for death caused by alleged wrongful act, criticised.* An instruction as follows: "The court instructs the jury that if they find the issue upon the plea in abatement against the defendant under the evidence and the instructions of the court, then it is their duty to assess the plaintiff's damages, and in assessing the damages they have a right to take into consideration all of the testimony bearing upon that question, and allow such damages as they may deem a fair and just compensation, with reference to the pecuniary injuries resulting from the death of the plaintiff's intestate to his widow and next of kin; and in estimating the plaintiff's damages they have a right to take into consideration whatever they may believe, from the evidence, the widow and next of kin might have reasonably expected, in a pecuniary way, from the continued life of the intestate. And, further in determining such pecuniary loss, the jury may, also, take into consideration the mental and physical capacity of the said Frederick Weber, his habits of industry and frugality, his means, opportunities and sobriety, the amount of his usual earnings, his prospects of life, and what he might in all probability earn and add to his estate, if all these means of information have been proved by the evidence, and from all these various sources of information, if proved by the evidence, in addition to the other above enumerated in this instruction, fix and estimate such amount of damages as in the best judgment of the jury will be a true and adequate compensation to the widow and next of kin of said deceased for whatever pecuniary loss they have sustained by reason of his death, not ex-

ceeding the amount claimed in the declaration,"—is criticised in the use of the word "means," but *held,* not ground for reversal.

Action on the case for death caused by alleged wrongful act. Appeal from the Circuit Court of Adams County; the Hon. ALBERT AKERS, Judge, presiding. Heard in this court at the November term, 1904. Affirmed upon *remittitur.* Opinion filed July 10, 1905. *Remittitur* filed and judgment affirmed July 11, 1905.

JOSEPH N. CARTER and MATTHEW F. CARROTT, for appellant; CHESTER M. DAWES, of counsel.

VANDEVENTER & WOODS, for appellee.

MR. JUSTICE GEST delivered the opinion of the court.

Appellee brought this suit charging appellant with negligently causing the death of Frederick Weber on the 16th day of July, 1903, while he was driving on a highway across the appellant's road in Adams county. The writ of summons bears date September 29, 1903, and the return of the sheriff on the summons was, to-wit: "Not being able to find the President of the within named, the Chicago, Burlington and Quincy Railroad Company, I have served the within summons on the within named, the Chicago, Burlington and Quincy Railroad Company, by reading the same and delivering to E. F. Bradford, agent of the said the Chicago, Burlington and Quincy Railroad Company, a true copy of the within this 2nd day of October, 1903." The defendant filed its duly verified plea in abatement averring that at the time of the supposed service of said summons upon the defendant said Bradford was not the agent of defendant at Quincy or elsewhere. Issue was made on that plea and this is the only issue made in the cause. Trial was had by a jury, the issue was found for the plaintiff, plaintiff's damages were assessed by the jury at $6,000 and the court after overruling a motion for a new trial entered judgment upon the verdict.

The first question presented for our determination is whether the verdict of the jury upon the issue presented by the plea in abatement should be sustained. The record shows

that the Chicago, Burlington and Quincy Railroad Company was and is by that name duly incorporated under the laws of Illinois, and also shows that the Chicago, Burlington and Quincy Railway Company was in October, 1901, duly incorporated under and in pursuance of the laws of Iowa with a period of existence of fifty years. The record also shows a copy of a lease from said railroad company to said railway company appearing to have been made November 20, 1901, and which in substance is as follows:

Article I declares that the lessor owns railway lines, situated in the States of Illinois, Iowa, Missouri, Wisconsin, Minnesota, Nebraska, Wyoming, South Dakota and Montana, of the aggregate length of 5,443.92 miles, with stations, yards, sidetracks, shops and other usual appurtenances of railways; and an equipment of engines, cars, machinery, tools and furniture for the maintenance and operation of said railways.

It next declares that the lessor holds leases for terms of long future duration of other lines of the length of 2,265 miles, with stations, etc.

In Article II the lessor leases to the lessee all of said lines owned by the lessor together with its rights, privileges, franchises, right of way, grounds, yards and stations, sidetracks, shops and machinery, tools, implements, etc. (describing different kinds of property of the lessor company), for a period of 99 years.

The lease further provides that the lessor sublets to the lessee all its leased lines, and property used to operate the same.

The lease also provides that during the term of the lease the lessee shall operate the leased railways in a prudent, diligent and faithful manner and so as to furnish reasonable accommodation to the public.

Section 6 provides that the lessee may make all betterments of and additions to the track, structures and plant of the railways leased, that may be required by public authority or that in its own judgment may be necessary or desirable in handling the traffic over said railways.

Section 13 states that the lessor hereby sells and transfers to the lessee all stocks of fuel and materials of all kinds on hand for use or consumption in maintaining or operating the railways leased; and all contracts for the purchase of such fuel or materials unfulfilled at the date of the lease; and lessee assumes all obligations of the lessor under such contracts and shall hold the lessor harmless on account of same.

Section 14 states that the lessor leases and assigns to lessee all other real and personal property not before mentioned and all the rights, privileges, immunities and franchises of lessor, except its franchise to be a corporation.

Article III of said lease provides for the compensation to be paid for such lease.

Article VI provides that the lessee shall provide offices for the lessor in the cities of Burlington, Iowa, and Chicago, Illinois, and that the lessee shall at all times permit the lessor's agents and officers to have free access to all such railways and other property.

Article VII provides for forfeiture of the lease for failure by the lessee to comply with its conditions.

The copy appears to be certified by T. S. Howland as secretary of the said railroad company who certifies under his signature and the seal of the company that he is the keeper of the papers, entries and records of said company and of its corporate seal and that the paper is a true and correct copy of said lease as the same appears from the original in his office remaining. The record also shows what appears to be a copy of a supplemental lease from said railroad company to said railway company which is certified in like manner by said Howland and bears date of November 20, 1901.

E. F. Bradford on behalf of the defendant testified that he was the person on whom the writ of summons was served as the agent of the defendant. He testified that he had been the general agent at Quincy of the defendant from November 1, 1887, until December 21, 1901, on which last named day he received the following circular letter:

## CIRCULAR NO. 1.

## CHICAGO, BURLINGTON & QUINCY RAILWAY COMPANY.

### OFFICE OF THE PRESIDENT.

Chicago, Ill., December 16, 1901.

This company has taken over, as lessee, and will operate, the railways and other properties owned and otherwise controlled by the Chicago, Burlington & Quincy Railroad Company. The officers and other employees of the Chicago, Burlington & Quincy Railroad Company, and the several companies subordinate thereto, will be retained by this company in the same positions as now occupied, with like authority and duties and at the same rates of pay.

'     GEO. B. HARRIS, President.

That on the 21st day of December, 1901, upon the receipt of that circular he ceased to be the agent of the railroad company and since has been the agent of the railway company; that the stamp he used in his office was changed to read railway company instead of railroad company and with that he stamped the folders and other printed matter in his office to read railway company instead of railroad company; that the employees of the railroad company were transferred to the railway company at the same time and in the same way; that the day agent and night agent, the day ticket agent and the night ticket agent, the freight agent, in short, all agents and employees remained just the same as before, the only difference being that the business was conducted in the name of and remittances of money were made to the railway company instead of the railroad company. Two other witnesses for defendant, Alvin C. Anders, freight agent, and A. S. Ellis, ticket agent at Quincy, testified substantially to the same matters. The plaintiff in due form objected to all the evidence so offered and specifically objected to the copies of leases on the ground that they were not the best evidence, were not the original documents, but the court overruled the objections and plaintiff duly excepted. Cross-error is as-

signed by appellee upon the ruling of the Circuit Court admitting the copies of leases. Doubtless the copies of leases above mentioned were deemed to be admissible in evidence under and by virtue of sections 15 and 16 of chapter 51 of the Revised Statutes concerning Evidence and Depositions. What the precise signification of the words "papers, entries and records" as used in that statute may be it is not deemed necessary to determine. It would seem that the scope of that statute is to authorize the admission in evidence of copies of the record of the acts and proceedings of the board or body of officers charged by law with the conduct of the business of the corporation in such matters and such matters only as by law are provided or required to be acted upon by such board or body. It is merely the action of such board or body on such matter which when committed to the "paper, entry or record" may be proven by a duly certified copy of such paper, entry or record.

The secretary of the railroad company certifies to no record of acts or proceedings of the board of directors of the company. He simply certifies "that he is the keeper of the papers, entries and records of said company and of its corporate seal and that said lease is a true and correct copy of said lease as the same appears from the original in his office remaining." Whether the views above expressed be correct or not, it appears clear that the statute does not authorize the admission in evidence of certified copies of mere contracts between parties. If this were a suit between the railroad company and the railway company the certified copies of leases would not be admissible; much less are they admissible against the public, one not a party thereto, as in this case. If these copies are admissible in this case, no reason is perceived why any and every private contract entered into by a corporation may not be by it proven in like manner, the production of the original be entirely dispensed with, and thereby one of the strongest safeguards of the rights of persons be completely destroyed. Manifestly no such power or privilege was intended to be granted to corporations. The construction of these sections of the statute

arose in the case of Chicago, Wilmington and Vermilion Coal Company v. Moran, 210 Ill., 9, and it was there held that contracts between parties are not within the meaning of the words "papers, entries and records." The cross-error is well assigned. The court erred in admitting in evidence the copies of leases. Striking that evidence from the record there remains no competent proof of any leasing by the railroad company to the railway company. The railroad of the railroad company was in active operation upon the day or at the time when the summons was served. The witness Bradford for many years previous to December 21, 1901, had been acting as agent at Quincy for the railroad company. From that date to the time of this trial he continued to occupy the same office premises, to do the same work and exercise the same powers and authority as theretofore. It must be presumed that he so continued with the knowledge of the defendant railroad company.

A railroad was in actual operation under the franchise granted to the defendant. The defendant was charged by law with the duty of operating that road. In the absence of proof of the alienation by it, in some manner authorized by law, of its corporate franchise to operate its railroad, public policy will not permit the defendant to deny that it was operating its road, or that Bradford was its agent at the time this writ was served. It follows necessarily that the summons was duly served, that the verdict and judgment upon the issue made by the plea in abatement were correct.

The court gave to the jury the following instruction:

"The court instructs the jury that if they find the issue upon the plea in abatement against the defendant under the evidence and the instructions of the court, then it is their duty to assess the plaintiff's damages, and in assessing the damages they have a right to take into consideration all of the testimony bearing upon that question, and allow such damages as they may deem a fair and just compensation, with reference to the pecuniary injuries resulting from the death of the plaintiff's intestate, to his widow and next of kin; and in estimating the plaintiff's damages they have a right

to take into consideration whatever they may believe, from the evidence, the widow and next of kin might have reasonably expected, in a pecuniary way, from the continued life of the intestate.  And, further in determining such pecuniary loss, the jury may, also take into consideration the mental and physical capacity of the said Frederick Weber, his habits of industry and frugality, his means, opportunities and sobriety, the amount of his usual earnings, his prospects of life, and what he might in all probability earn and add to his estate, if all these means of information have been proved by the evidence, and from all these various sources of information, if proved by the evidence, in addition to the other above enumerated in this instruction, fix and estimate such amount of damages as in the best judgment of the jury will be a true and adequate compensation to the widow and next of kin of said deceased for whatever pecuniary loss they have sustained by reason of his death, not exceeding the amount claimed in the declaration."

The giving of this instruction is assigned as error. The particular objection made to it is the use of the word "means."  The evidence shows that the deceased was the owner of considerable property, that he and his family had accumulated it with hard work, that his family consisted of wife and six children, five of whom were boys; that four of the boys were of ages from twenty-two to twenty-nine years and one was fifteen, the daughter was nineteen; that all the children lived at home, were unmarried and worked without wages; that the deceased was sixty-two years of age at his death and had always been a sober, healthy and industrious man; that the family made from one to three thousand dollars a year upon the farm of deceased consisting of two hundred and fifty-five acres; that the services of each of the adult boys were worth two hundred dollars per year besides board, clothes and "spending money."

If the deceased had been shown to be a poor man the instruction would have been manifestly bad.  The wealth or poverty of the deceased is entirely immaterial.  The material question under the statute always is:  What pecuniary loss

C., B. & Q. R. R. Co. v. Weber.

have the widow and next of kin sustained by the death of the deceased? If the instruction had stated that the jury might consider "his means and opportunities with reference to the making and saving of money or money's worth" it would have been unobjectionable. C., P. & St. L. R. R. v. Woolridge, 174 Ill., 335. It may be that the jury concluded from the instruction that, as the deceased had accumulated the "means" he had at the time of his death, he would continue to accumulate at the same rate and that they should find their verdict accordingly. Such a conclusion would not be warranted by the evidence in this case. It is not clear that the jury were misled by the instruction nor is it clear that they were not misled thereby. It is also urged that the damages assessed, $6,000, are excessive. After careful consideration of all the evidence we are inclined to think the damages are large, and when we consider the amount of the verdict in connection with the instruction above stated we are constrained to the conclusion that judgment for that amount should not stand. If the plaintiff shall within ten days after the filing of this opinion, file in this court his *remittitur* of $2,000, judgment for the balance will be affirmed, otherwise the judgment will be reversed and the cause remanded to the Circuit Court.

Affirmed upon *remittitur* of $2,000, within ten days, otherwise reversed and remanded.

*Remittitur* filed and judgment affirmed July 11, 1905.